IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Richmond Division



| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK ACCOUNT [100005940458283] THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | Case No. 3:22-SW-191 **Filed Under Seal** _____ |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Todd Fleming, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, and have been so employed since February 2005.  I am a graduate of the eleven-week Criminal Investigator Training Program and the fourteen-week ATF Special Agent Basic Training Academy, both of which are taught at the Federal Law Enforcement Training Center

(FLETC) in Glynco, Georgia.  I have received specialized training concerning violations of the Gun Control Act within Title 18, the Safe Explosives Act within Title 18 and the National Firearms Act within Title 26 of the United States Code.  I am a duly sworn agent who is authorized to carry firearms, execute warrants and make arrests for offenses against the United States and to perform such other duties as authorized by law.

3.      I have investigated cases involving violent crime, organized criminal gangs, Hobbs Act Robberies, illegal firearms trafficking/possession and narcotics possession/distribution.  I have investigated numerous cases that have resulted in convictions in both federal and state court.

4.      Prior to being employed with the ATF, I was employed for over twelve years with the Virginia State Police where I completed the twenty-six-week Virginia State Police Academy. As an employee of the Virginia State Police, I served as a Trooper, Narcotic Canine Handler and a Special Agent assigned to the Drug Enforcement Section.  I investigated criminal activity, drug possession and distribution and obtained numerous arrest and search warrants.

5.      Before working for the Virginia State Police, I was employed as a patrol officer for three years at the police department in Big Stone Gap, Virginia.  During that time, I completed the eleven-week basic law enforcement academy.

6.      I have participated in the preparation and execution of numerous state and federal arrest and search warrants for criminal offenses over the years, including those involving Hobbs Act Robberies, firearms trafficking, narcotics trafficking and the illegal possession/use of firearms.

7.      I am familiar with the methods that drug traffickers and illegal firearms traffickers use to communicate with others in order to conduct their illegal activities to include using

2

communication methods such as Facebook Messenger to send and receive messages pertaining to their chosen activities.

8.      The facts in this affidavit come from my personal observations, my training and experience and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(g)(9): Possession of firearms after having been convicted of a crime of domestic violence; 26 U.S.C. § 5861(d): Possession of a firearm not registered in the National Firearms Registry and Transfer Record have been committed by Chad A. COOK.

10.      There is also probable cause to search the information described in Attachment A for evidence of these crimes, contraband, and fruits of these crimes, as described in Attachment B.

**<u>PROBABLE CAUSE</u>**

11.       On August 25, 2020, Chad COOK was arrested for state violations of larceny, drug possession and firearm possession.  In relation to the larceny charges, a state search warrant was executed at the residence, near Farmville, Virginia, where COOK resided with his girlfriend. In addition to finding the stolen property and clothing that COOK wore during the theft, a gun safe was searched and was found to contain multiple firearms that belonged to COOK.  Among the items recovered from the residence on August 25, 2020, was a Yankee Hill Machine, .30 caliber firearm silencer, bearing serial number R-4829, not registered to COOK in the National Firearms Registration and Transfer Record as well as another unmarked suspected silencer.

3

Although the safe could have been searched pursuant to the warrant, it was locked, and a code had to be entered to open it without damage.  The resident of the house entered the code and opened the safe.

12.     The state agents later learned that COOK had three previous convictions for Domestic Violence in Virginia.  Specifically, COOK was convicted of Domestic Violence on July 24, 2007, August 5, 2008 and October 20, 2011, in violation of Virginia Code Ann. 18.2-57.2.  Each case involved an element of force against the mother of COOK's child and, according to court records, COOK was represented by an attorney in each case.  COOK is therefore prohibited from possessing firearms under Title 18 U.S.C. § 922(g)(9).

13.     On October 5, 2020, the affiant and members of the Piedmont Regional Narcotics and Gang Task Force went to the previously mentioned Farmville residence and received consent to search the gun safe, outbuilding, and garage/shop on the property.  Multiple firearms were located in the gun safe.  One additional suspected firearm silencer was also located during the search.  According to the resident of the house, all firearms in the safe belonged to Chad COOK.  All totaled, officers seized 37 firearms, the suspected silencer, and in excess of 8,500 rounds of ammunition.

14.     Agent Fleming submitted the three suspected silencers to the U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives Firearms Technology Criminal Branch for analysis.  The resultant Report of Technical Examination revealed that all three devices are firearm silencers, which are firearms as defined in Title 26 United States Code § 5845(a)(7).

15.     Chad COOK's Facebook Profile ID is: 100005940458283 and is located at https://www.facebook.com/chad.cook.507464.  A review of COOK's public Facebook Page

4

revealed that on July 2, 2020, he posted a photograph of multiple firearms laying on a blanket in a yard with a caption that read in part, "Like to give a big thanks to last defense armory for the great job he did last past year on cerakoting my guns."  There are twelve firearms in the photograph.  At least eight of them were seized during the searches.

16.     Investigator Gilliam with the Piedmont Regional Narcotics and Gang Task Force obtained a search warrant for COOK's cellular phone.  The search warrant was executed by the Virginia State Police High Tech Crimes Unit on September 2, 2020.  A review of the downloaded data indicated that COOK utilized Facebook Messenger to communicate with other individuals pertaining to firearms.

17.     On November 23, 2019, COOK received a message via Facebook Messenger from the account belonging to Coda Marie.  The message read, "Hi this is andy johnson the one about the gun you're wantnh to get sorry my facebook got temporary block so I cant send messages or anything for 24 hours this is my gfs facebook but was wondering if you was still wanting to comepick the gun up tomorrow."

18.     In a separate Facebook Messenger conversation dated July 4, 2020 at 4:02PM, Facebook Messenger user, Akeem Kimbrough sent a message to COOK that stated, "4 sale." Immediately following this message, Kimbrough sent an unknown image.  At 4:04PM, Kimbrough sent a follow-up message that read, "Yoyo."  At 4:07PM, COOK replied, "How much." At 4:08PM, Kimbrough responded, "Dude want like 250."  At 4:08PM, COOK replied, "45." COOK then sent another message stating, "Bring it to the shack." At 4:09PM, Kimbrough responded, "I'm about to see if it's a 45."  A few seconds later, COOK replied, "It is."  At 4:11PM, Kimbrough said, "I'm talking to dude now."  COOK replied, "Ok" and then asked, "Who makes it." At 4:12PM, Kimbrough responded, "He said it's a 1911."  To which COOK

asked, "Colt?" At 4:13PM, Kimbrough wrote, "I'm going to pull up on him now." At 4:26PM,

COOK asked, "What's the word."

19.     Based on the agent's training and experience, the above-mentioned conversation

is talking about the purchase of a Colt, Model 1911, .45 caliber semi-automatic pistol.

20.     COOK has been incarcerated since being taken into custody on October 5, 2020,

and subsequently would not have access to a computer to make his own Facebook posts.  An

April 27, 2022, review of COOK's public Facebook postings revealed that he has not made any

new posts since October 2020.

21.     On November 2, 2021, during a consensual interview with law enforcement,

COOK stated that he would sometimes buy guns off of Facebook Marketplace and in order to

buy the gun, they would have to do the transfer (purchase and paperwork through a federally

licensed firearms dealer).  COOK indicated that when he was asked about domestic violence or

felony convictions is when he learned he could not buy a gun.

22.     Further indications that COOK knew he could not possess firearms are that

COOK won a firearm at a Duck's Unlimited Banquet and then had his brother C.B. Cook go to

the federal firearms licensee to fill out the ATF Form 4473 and Virginia State Police S.P. 65 in

order to pass the background check and receive the firearm.  In addition, COOK had a friend /

federal firearms licensee order a silencer for him.  Before a silencer can be transferred to anyone,

an ATF Form must be submitted to the National Firearms Act Branch for background checks and

approval.  That process can take months to complete.  COOK was found to be in possession of a

silencer that had been shipped to Last Defense Armory, which is owned by COOK's friend, S.W.

No ATF / NFA paperwork had been completed by COOK prior to taking possession of the

silencer.  Had the paperwork been properly submitted, the transfer would have been denied as COOK is prohibited from possessing firearms.

23.     Each of the aforementioned recovered firearms, save for the two silencers recovered on October 5, 2020, shipped in interstate commerce prior to COOK's possession.  The two silencers recovered on October 5, 2020, based on COOK's own admission, were manufactured by COOK in Virginia.

## META

24.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

25.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

26.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account

includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

27.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

28.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

29.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes.  Users can "tag" other users in a photo or video, and can be tagged by others.  When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

8

30.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video.  Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. of the date of each call.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

31.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

32.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

33.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

34.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

35.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

36.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user

9

accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

37.     Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform.  For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

38.     Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

39.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

40.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can

10

indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

41.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

42.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

43.     Based on the foregoing, I request that the Court issue the proposed search warrant.

44.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Meta.  Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

45.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

46.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

12

Respectfully submitted,

TODD FLEMING   Digitally signed by TODD
FLEMING
Date: 2022.11.07 11:57:05 -05'00'

Todd Fleming
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me by telephone on November 7, 2022.

/s/  MRC

Mark R. Colombell
UNITED STATES MAGISTRATE JUDGE

13

**<u>ATTACHMENT A</u>**

**Property to Be Searched**

This warrant applies to information associated with Facebook user ID 100005940458283 that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

I.    **Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)    All contact and personal identifying information, including ID **100005940458283:** full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.]]

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities **from November 23, 2018 to October 5, 2020**;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them **from November 23, 2018 to October 5, 2020**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)    All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)    All other records and contents of communications and messages made or received by the user **from November 23, 2018 to October 5, 2020**, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)    All "check ins" and other location information;

(h)    All IP logs, including all records of the IP addresses that logged into the account;

(i)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)    All information about the Facebook pages that the account is or was a "fan" of;

(k)    All past and present lists of friends created by the account;

(l)    All records of Facebook searches performed by the account **from November 23, 2018 to October 5, 2020**;

(m)   All information about the user's access and use of Facebook Marketplace;

(n)    The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within **14 DAYS** of issuance of this warrant

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of  18 U.S.C. § 922(g)(9): Possession of firearms after having been convicted of a crime of domestic violence; 26 U.S.C. § 5861(d): Possession of a firearm not registered in the National Firearms Registry and Transfer Record involving Chad Cook from November 23, 2018 to October 5, 2020, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)     Communications between Cook and others discussing the purchase or sale of firearms

(b)     Photographs of firearms

(c)     Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and

3

events relating to the crime under investigation and to the Facebook account
owner;

(d)     Evidence indicating the Facebook account owner's state of mind as it relates to
the crime under investigation;

(e)     The identity of the person(s) who created or used the user ID, including records
that help reveal the whereabouts of such person(s).